UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

RICHARD A.,[1]

                          Plaintiff                    DECISION AND ORDER

-vs-

                                                      1:20-CV-0680 CJS

COMMISSIONER OF SOCIAL
SECURITY,

                          Defendant.

_____

## INTRODUCTION

This is an action brought pursuant to 42 U.S.C. § 405(g) to review the final determination of the Commissioner of Social Security ("Commissioner" or "Defendant") which denied the application of Plaintiff for Social Security Disability Insurance benefits. Now before the Court is Plaintiff's motion (ECF No.11) for judgment on the pleadings and Defendant's cross-motion (ECF No. 13) for the same relief.   For the reasons discussed below, Plaintiff's application is denied and Defendant's application is granted.

## STANDARDS OF LAW

The Commissioner decides applications for SSDI and SSI benefits using a five-step sequential evaluation:

> A five-step sequential analysis is used to evaluate disability claims. *See* 20 C.F.R. §§ 404.1520, 416.920.   First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the Commissioner next considers whether the claimant has a severe impairment which significantly limits his physical or mental ability to

---

[1] The Court's Standing Order issued on November 18, 2020, indicates in pertinent part that, "[e]ffective immediately, in opinions filed pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), in the United States District Court for the Western District of New York, any non-government party will be identified and referenced solely by first name and last initial."

> do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in the regulations [or medically equals a listed impairment].   Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work.[2]  Finally, if the claimant is unable to perform his past work, the Commissioner then determines whether there is other work which the claimant could perform.   The claimant bears the burden of proof as to the first four steps, while the Commissioner bears the burden at step five.

*Colvin v. Berryhill*, 734 F. App'x 756, 758 (2d Cir. 2018) (citations and internal quotation marks omitted)

An unsuccessful claimant may bring an action in federal district court to challenge the Commissioner's denial of the disability claim.   In such an action, "[t]he court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C.A. § 405(g) (West).   Further, Section 405(g) states, in relevant part, that "[t]he findings of the Commissioner of Social security as to any fact, if supported by substantial evidence, shall be conclusive."

---

[2] Residual functional capacity "is what the claimant can still do despite the limitations imposed by his impairment." *Bushey v. Berryhill*, 739 F. App'x 668, 670–71 (2d Cir. 2018) (citations omitted); *see also*, 1996 WL 374184, Titles II & Xvi: Assessing Residual Functional Capacity in Initial Claims, SSR 96-8P (S.S.A. July 2, 1996).

2

The issue to be determined by the court is whether the Commissioner's conclusions "are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard." *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998); *see also, Barnaby v. Berryhill*, 773 F. App'x 642, 643 (2d Cir. 2019) ("[We] will uphold the decision if it is supported by substantial evidence and the correct legal standards were applied.") (citing *Zabala v. Astrue*, 595 F.3d 402, 408 (2d Cir. 2010) and *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012).").

"First, the [c]ourt reviews the Commissioner's decision to determine whether the Commissioner applied the correct legal standard." *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999); *see also, Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) ("[W]here an error of law has been made that might have affected the disposition of the case, this court cannot fulfill its statutory and constitutional duty to review the decision of the administrative agency by simply deferring to the factual findings of the ALJ. Failure to apply the correct legal standards is grounds for reversal.") (citation omitted).

If the Commissioner applied the correct legal standards, the court next "examines the record to determine if the Commissioner's conclusions are supported by substantial evidence." *Tejada v. Apfel*, 167 F.3d at 773. Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. (citation omitted).

> The substantial evidence standard is a very deferential standard of review—even more so than the 'clearly erroneous' standard, and the Commissioner's findings of fact must be upheld unless a reasonable factfinder would have to conclude otherwise." *Brault v. Social Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012) (per curiam) (emphasis in

3

original). "An ALJ is not required to discuss every piece of evidence submitted, and the failure to cite specific evidence does not indicate that such evidence was not considered." *Id*.

*Banyai v. Berryhill*, 767 F. App'x 176, 177 (2d Cir. 2019), as amended (Apr. 30, 2019) (internal quotation marks omitted).

In applying this standard, a court is not permitted to re-weigh the evidence. *See, Krull v. Colvin*, 669 F. App'x 31, 32 (2d Cir. 2016) ("Krull's disagreement is with the ALJ's weighing of the evidence, but the deferential standard of review prevents us from reweighing it."); *see also, Riordan v. Barnhart*, No. 06 CIV 4773 AKH, 2007 WL 1406649, at *4 (S.D.N.Y. May 8, 2007) ("The court does not engage in a *de novo* determination of whether or not the claimant is disabled, but instead determines whether correct legal standards were applied and whether substantial evidence supports the decision of the Commissioner.") (citations omitted).

FACTUAL and PROCEDURAL BACKGROUND

The reader is presumed to be familiar with the facts and procedural history of this action. The Court will refer to the record only as necessary for purposes of this Decision and Order.

Plaintiff claims to have become disabled as of April 1, 2016, due to a combination of impairments including degenerative disc disease of the cervical spine, headaches, shoulder pain, arm weakness, memory problems and history of concussion. Prior to that, Plaintiff had worked in a warehouse for the United Parcel Service ("UPS"). Plaintiff contends that his medical problems started when he banged his head on a forklift, resulting in a concussion and shoulder pain. Plaintiff eventually had spinal

surgery on his neck, to address pain, but he maintains that the surgery was not helpful and resulted in restricted movement of his head, along with headaches and neurologic deficits.

On March 6, 2019, the ALJ issued a decision finding that Plaintiff was not disabled at any time between the alleged onset date and the date of the decision.   In that regard, the ALJ found, in pertinent part, that Plaintiff had a single severe impairment – "degenerative disc disease of the cervical spine status post-fusion" – which, even when combined with several non-severe impairments, did not meet or medically equal a listed impairment. The ALJ further found that even with his impairments, Plaintiff had the RFC to perform less than a full range of light work. Specifically, the ALJ found that Plaintiff could only

> frequently push or pull or reach overhead with both upper extremities.
> The claimant can frequently kneel, stoop, crouch and crawl.   Additionally,
> he can occasionally climb ladders, ropes, and scaffolds and occasionally
> be exposed to vibrations.   He can have occasional exposure to dust,
> noxious odors and fumes, poor ventilation, extreme cold, and wetness.
> Finally, the claimant requires a moderate noise work environment[.]

Tr. 17.   The ALJ found that with such RFC the Plaintiff could not perform his past work but could perform other jobs in the national economy that were identified by a vocational expert ("VE").

In making his RFC determination, the ALJ reviewed the medical evidence and concluded that "[t]he evidence does not support that the claimant's symptoms from degenerative disc disease of the cervical spine with headaches are as severe as alleged." Tr. 18.   In this regard, the ALJ discussed the objective evidence of

5

degenerative changes in Plaintiff's cervical spine.   For example, the ALJ indicated that an April 2016 x-ray of Plaintiff's neck showed "evidence of instability on flexion extension at the C4-5 level and anterolisthesis of C4 on C5 on flexion." Tr. 18.   The ALJ also acknowledged that a July 2016 MRI of Plaintiff's cervical spine showed "disc herniation at C4-5 and C5-6," "with no spinal stenosis," Tr. 19.   The ALJ recounted how these findings led to Plaintiff having anterior cervical discectomy and fusion ("ACDF") surgery in July 2016, Tr. 20, after which Plaintiff complained of some numbness in his right arm, and how examination found paresthesias (nerve-related tingling or "pins and needles") of the right arm, along with slightly reduced strength in the arms and limited range of motion of the neck. Tr. 21.     Additionally, the ALJ observed that post-surgery imaging in January 2017 showed "spondylolisthesis at the C4-5 level and neural foraminal stenosis at the C5-6 level." Tr. 20.   The ALJ also noted that a May 2018 CT scan study now showed "bilateral facet arthropathy at C7-T1 and grade one anterolisthesis with an associated focal central protrusion type of disc herniation at C3-4," with a "suggestion of asymmetric disc herniation at C6-7 on the left." Tr. 21.

      However, the ALJ repeatedly emphasized that Plaintiff's physical examination findings, both before and after surgery, were "generally normal." Tr. 20, 21, 22, 25.   The ALJ also pointed out that some examiners found only mild evidence of restriction, while other examiners reported no abnormalities.   For example, the ALJ discussed how examinations in April, May and June 2016 by Plaintiff's orthopedic providers found limited range of movement in the neck, tenderness of the cervical spine, slightly reduced sensation and slightly reduced strength, while examinations in June 2016 by

6

Plaintiff's primary care doctor and by an emergency room doctor found no abnormal signs or deficits. Tr. 19.[3]  The ALJ stated that physical examinations of Plaintiff's neck in December 2016 and January 2017 produced normal findings, except for reduced range of motion secondary to pain, and that an examination in May 2017 showed "a full range of motion without pain in [Plaintiff's] neck and cervical spine." Tr. 20.

The ALJ further referenced a worker's compensation examination in December 2016, at which Plaintiff complained of constant neck pain and headaches, claimed that he was unable to walk any distance, indicated that he could sit for only five minutes at a time, and stated that reaching overhead made his pain worse. Ex. 8F at p. 7.  However, the examiner, Robert Karpman, M.D. ("Karpman"), who in addition to examining Plaintiff reviewed all of Plaintiff's medical records, concluded that Plaintiff's "subjective complaints [were] not consistent with or proportional to the objective findings" and that Plaintiff was "capable of performing all the tasks of daily living and maintaining full employment with no restrictions." *Id*. at pp. 9-10.  In that regard, Karpman reported normal findings, except for reduced range of motion in Plaintiff's cervical spine, as to which Karpman stated that, "There was *suboptimal effort* during the examination." *Id*. at p. 8 (emphasis added).

---

[3] The emergency room notes state that Plaintiff's only complaint was of chest pain, and that he was in no acute distress and had normal range of movement in his neck and back. Exhibit 1F at p. 12.

The ALJ further noted how, at a consultative examination performed on January 26, 2017, David Brauer, M.D. ("Brauer") reported normal findings, except for reduced range of motion in the cervical and lumbar spines. Tr. 1033.   Brauer stated that Plaintiff had no limitation on his ability to sit, stand or walk; moderate limitation of his ability to push, pull, lift or carry heavy objects; moderate to marked limitation in performing activities that require bending, squatting or fully rotating the head; and moderate to marked limitation in performing activities that require reaching or lifting overhead. Tr. 1033-1034.

The ALJ further noted that in the months following these examinations, Plaintiff's treating orthopedic providers reported findings consisting of decreased range of motion in cervical spine secondary to pain, slightly reduced sensation, and slightly reduced strength. Tr. 20.   The ALJ noted, though, that when Plaintiff visited the emergency room again in May 2017, complaining of headaches evidently related to a toothache,[4] doctors reported essentially normal findings including full strength, normal reflexes, no neurological deficits, no vertebral tenderness, normal cervical spine and full range of motion in the neck and cervical spine without pain. Tr. 20, 1265.   Particularly regarding Plaintiff's neck, the report stated: "Neck: External neck: is normal. C-spine: appears grossly normal, nor vertebral tenderness, no crepitus, ROM/movement is normal, is supple, without pain, nor range of motion limitations." Tr. 1265.

---

[4]  Plaintiff reportedly told the emergency room staff that he previously had headaches related to a motor vehicle accident ("MVA") two years earlier, though the Court sees no reference to such an accident elsewhere in the records. Tr. 1264.

The ALJ further indicated that notes from additional visits with Plaintiff's orthopedic providers during 2017 and 2018 continue to note the same limited findings as before, consisting of reduced range of motion in the neck due to pain, reduced sensation, reduced strength and tenderness on palpation. Tr. 21.

The ALJ observed, however, that at a neuropsychological evaluation in May 2018, the consultative evaluator, Michael Santa Maria, Ph.D. ("Santa Maria"), concluded that Plaintiff was "malingering" and that his statements about his cognitive and physical symptoms were grossly exaggerated and could not be accepted at face value. Tr. 1367 ("The profile is remarkable for grossly exaggerated general symptom endorsement."); 1368 ("In fact, his performance on one effort measure was so poor that performance was at chance level; performance was on par with what would be expected for a monkey or a rat or a single-celled organism responding at random."); 1368 ("[T]here are multiple indications of poor effort and multiple indications of malingered cognitive dysfunction."); 1368 ("[H]is reports of cognitive, emotional and physical symptoms cannot be taken at face value given multiple indications of poor effort and symptom exaggeration."); 1368 ("*Moreover, while he reports physical limitations his report of symptoms as such is highly suspect, particularly in situations in which there is an absence of clearly corroborative physiological workup to support such claim.*") (emphasis added);

The ALJ found, based on his review of the evidence, that "the claimant had generally normal physical examination findings," and that, "[o]verall, the claimant's physical examination findings are inconsistent with his allegations." Tr. 22.   The ALJ

9

further found that Plaintiff's allegations were inconsistent with his activities of daily living, which included driving, shopping, preparing meals for himself and caring for his two children. Tr. 23.

Regarding medical opinion evidence, the ALJ stated preliminarily that he "considered opinion evidence in accordance with the requirements of 20 CFR 404.1527," Tr. 17, which includes subsection (c)(2), also known as the "treating physician rule."  The ALJ further stated that he gave "some weight" to several opinions insofar as he found them to be consistent with examination findings and the overall medical record. Tr. 23-24.  In that regard, the ALJ indicated that he was limiting Plaintiff to less than a full range of light work, as reflected in the RFC finding, with restrictions roughly mirroring those contained in Dr. Brauer's opinion. Tr. 23.[5]

However, the ALJ gave "little weight" to opinions from Plaintiff's treating orthopedist, Ross Sherban, D.O. ("Sherban") and treating occupational-medicine physician Stuart Dorfman, M.D. ("Dorfman").  Sherban and Dorfman both indicated that Plaintiff had functional limitations which, according to the VE's testimony, would prevent Plaintiff from working.  For example, on March 31, 2016, Dorfman indicated that Plaintiff was "33%" "disabled" and should be restricted to lifting 10 pounds or less, with no repetitive or overhead lifting, and with pushing and pulling limited to five pounds, Tr. 1096, while on December 13, 2018, Sherban completed a residual functional capacity questionnaire indicating the following: Plaintiff cannot tolerate stress and is "incapable of even 'low stress' jobs"; he can only sit or stand for twenty minutes at a time; he can sit,

---

[5] Except that, the ALJ did not include any restriction on neck movement in the RFC finding.

stand or walk all for less than two hours per day; he must take a break to walk every twenty minutes; he can only occasionally lift and carry ten pounds; he must never look down and may only rarely move his head up or side to side; he can use his hands only 10% of the day; he can use his arms 0% of the day; he would miss more than four days of work per month; and he is not able to sustain full-time employment. Tr. 1410-1414.[6]

The ALJ indicated that he gave both opinions only "little weight" because they were "not consistent with the record as a whole." Tr. 24-25.   More specifically, as to Sherban's opinion the ALJ stated:

> While I find that some limitations for the claimant are warranted, Dr. Sherban's opinion that the claimant requires these significant limitations is inconsistent with the record as a whole.   The claimant had generally normal physical examination findings both before and after surgery, as discussed in detail above.   The claimant also had only mild findings on diagnostic imaging reports.

Tr. 24.   Similarly, regarding Dorfman's opinion[7] the ALJ stated:

> Dr. Dorfman's significant limitations are not consistent with the medical record as a whole, including his own treatment notes that showed generally normal physical examination findings including generally full strength, generally intact sensation, normal reflexes, and no neurological deficits.

Tr. 25. These statements by the ALJ came after his more thorough discussion of the medical evidence mentioned earlier.

---

[6] When asked to "identify the clinical findings and objective signs" supporting his opinion, Sherban wrote, "See note."   No notes were attached to the report, so the Court assumes he was referring to his own office treatment notes.   In terms of clinical findings and objective signs, Sherban's office notes refer to the objective diagnostic studies discussed earlier, and list various findings including "moderate to severe tenderness over the lower cervical region," reduced range of movement of the neck due to pain and slightly reduced sensation.

[7] Specifically, Dorfman's opinion from March 2016.

The ALJ also clearly indicated that he did not find Plaintiff's subjective complaints to be credible, for several reasons.  For instance, the ALJ noted that at the hearing Plaintiff was oddly evasive about where and with whom he lived, initially claiming that he had no permanent address, then acknowledging, only after pointed questioning by the ALJ, that he lived with his girlfriend and their two children. Tr. 53, 58-61.  Plaintiff further admitted that he cared for the children when his girlfriend was at work.  Even then, however, Plaintiff insisted that he also sometimes "lived" with his grandfather, though upon still further questioning by the ALJ he admitted that even when he was "living" with his grandfather, he returned home each night to care for his children while his girlfriend, who worked the night shift, was at work. Tr. 60-61.  In his decision, the ALJ commented on Plaintiff's inconsistent statements on this point. Tr. 18.  Further, the ALJ noted that Plaintiff also gave inconsistent testimony about whether he owned a car or was able to drive himself places.  Indeed, Plaintiff initially indicated that he neither had a car nor drove, but upon further questioning by the ALJ he stated that he had lost his car a week earlier, and had been driving up until that point.  Regarding this testimony, the ALJ wrote: "Although the claimant testified that he did not drive and did not have a car, he later testified that he had a car up to about one week ago.  He also testified that he was able to drive himself to and from doctor appointments until he lost the car one week ago." Tr. 18, 61.  Additionally, the ALJ commented several times in his decision on the fact that Dr. Santa Maria had found that Plaintiff was likely malingering and exaggerating his alleged cognitive and physical symptoms. Tr. 13, 15, 16, 22.

12

In this action, Plaintiff contends that the Commissioner's decision denying benefits must be reversed for the following reasons: 1) the ALJ failed to properly apply the "treating physician rule" to the opinions of Sherban and Dorfman; and 2) the ALJ's RFC finding is based on "impermissible lay surmise" as opposed to substantial evidence. Plaintiff does not challenge the ALJ's findings at the first three steps of the sequential evaluation.

Defendant disputes Plaintiff's arguments and maintains that the ALJ's decision is free of reversible legal error and supported by substantial evidence.

The Court has carefully reviewed and considered the parties' submissions.

## DISCUSSION

<u>The ALJ's Alleged Failure to Follow the Treating Physician Rule</u>

Plaintiff contends that the ALJ failed to follow the "treating physician rule" in two respects: First, he failed to give controlling weight to the opinions of Dr. Sherban and Dr. Dorfman, instead giving them only "little weight"; and second, he then failed to expressly discuss the "*Burgess* factors" that are used to evaluate the weight to be given to the opinion of a treating doctor when that opinion is not given controlling weight.

A treating physician's opinion is entitled to "controlling weight" "only so long as it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record." *Curry v. Comm'r of Soc. Sec.*, 855 F. App'x 46, 48 (2d Cir. 2021) (citations and internal quotation marks omitted).

> When assigning less than "controlling weight" to a treating physician's opinion, the ALJ must "explicitly consider" the four factors announced in *Burgess v. Astrue*, 537 F.3d 117 (2d Cir. 2008). *Estrella v. Berryhill*, 925 F.3d 90, 95 (2d Cir. 2019) (internal quotation marks omitted). Those factors are "(1) the frequen[cy], length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Id*. at 95–96 (citation omitted). A reviewing court should remand for failure to consider explicitly the *Burgess* factors unless a searching review of the record shows that the ALJ has provided "good reasons" for its weight assessment. *Id*. at 96.

*Meyer v. Comm'r of Soc. Sec.*, 794 F. App'x 23, 26 (2d Cir. 2019); *see also*, 20 CFR 404.1527(c) (listing the factors to be considered as to all medical opinion evidence, except where controlling weight is given to a treating physician's opinion). Put differently, an ALJ's failure to explicitly consider the *Burgess* factors when assigning less-than-controlling weight to a treating physician's opinion is a "procedural error" that will require remand, unless the ALJ provides sufficiently good reasons for his weight assignment that the court can conclude the substance of the treating physician rule was respected. *See, Estrella v. Berryhill*, 925 F.3d at 96 ("An ALJ's failure to 'explicitly' apply the *Burgess* factors when assigning weight at step two is a procedural error. If the Commissioner has not otherwise provided 'good reasons' for its weight assignment, we are unable to conclude that the error was harmless and consequently remand for the ALJ to comprehensively set forth [his or her] reasons. If, however, a searching review of the record assures us that the substance of the treating physician rule was not traversed, we will affirm.") (citation and internal quotation marks omitted).

Plaintiff here contends that the ALJ's treatment of the opinions of Sherban and Dorfman, which, if given controlling weight would have resulted in a finding of disability, was erroneous and requires reversal.  However, the Court disagrees.  To begin with, the Court finds that the ALJ did not err in declining to give controlling weight to the opinions of Sherban and Dorfman.  In that regard, the ALJ determined that the opinions were not consistent with the medical record as a whole or with Plaintiff's activities of daily living, and that determination is supported by substantial evidence.  As the ALJ discussed, the record contains various medical opinions and treatment notes indicating that Plaintiff had no limitations or signs of neck injury *whatsoever*, at or around the very same time that Sherban and Dorfman were indicating that he was disabled.  The ALJ further emphasized that Plaintiff admitted to driving a car up until a week prior to the administrative hearing, which is inconsistent with Sherban's opinion that Plaintiff was essentially unable to move his head. Tr. 1413 (Sherban opined that Plaintiff could "never" look down and could only "rarely" turn his head left or right).

Moreover, even assuming *arguendo* that the ALJ committed a procedural error by failing to explicitly discuss each and every *Burgess* factor when weighing the opinions of Sherban and Dorfman, the error was harmless, since a searching review of the record shows that the substance of the treating physician rule was respected, meaning that the ALJ provided 'good reasons' for his weight assignments.  As discussed earlier, prior to specifically discussing the weight to be assigned to the opinions from Sherban and Dorfman, the ALJ reviewed and summarized the medical

15

record, and explained how the findings by Dorfman and, to a larger extent, Sherban,[8] were inconsistent with the findings of other treating doctors (emergency room doctors) and consultative examiners (Karpman, Brauer, Santa Maria), and how even the positive findings by Sherban and Dorfman, as well as the results of the diagnostic studies, were relatively minor,[9] notwithstanding the fact that Plaintiff chose to have surgery.

Very significantly, the ALJ also emphasized the evidence indicating that Plaintiff appeared to be exaggerating his symptoms.  Indeed, independent of each other, two different consultative examiners (Karpman and Santa Maria) opined that Plaintiff was malingering, which, in the Court's experience, is unusual.  Such exaggeration would explain why, for example, Sherban's opinion contains restrictions that seem to far exceed what would be expected from the relatively benign findings reflected in his own treatment notes.  In other words, it appears that Sherban's opinion is based largely on Plaintiff's subjective complaints about his limitations, as opposed to actual objective findings by Sherban. *See, e.g.*, *Charbonneau v. Astrue*, No. 2:11-CV-9, 2012 WL 287561, at *8 (D. Vt. Jan. 31, 2012) ("[A]lthough the [evaluation] included objective tests, such as range of motion and straight leg raising, the results of these tests were largely subjective, given that they were dependent on Charbonneau's reports of pain."). Indeed, the extent to which this seems to be true is shown by the fact that Sherban's office notes oddly incorporate, as purported fact, Plaintiff's criticisms of the consultative

---

[8] Dorfman only treated Plaintiff in 2016.
[9] Plaintiff summarizes these findings, in his Memorandum of Law, as consisting of neck tenderness, decreased range of motion in the neck, lowered sensation at C5-6 and mildly limited right-sided strength. ECF No. 11-1 at pp. 15–17.

examination performed by Dr. Karpman,[10] with a view toward assisting Plaintiff in obtaining worker's compensation and/or disability benefits. *See, e.g.*, Tr. 1112.

Of course, doctors frequently rely on what patients tell them, and rightly so. The problem here, however, is that the ALJ found that Plaintiff was not credible, which finding is clearly supported by substantial evidence. Under such circumstances, the ALJ may choose not to credit the doctor's opinion:

> If a treating provider's opinions are based to a large extent on an applicant's self-reports and not on clinical evidence, and the ALJ finds the applicant not credible, the ALJ may discount the treating provider's opinion. However, when an opinion is not more heavily based on a patient's self-reports than on clinical observations, there is no evidentiary basis for rejecting the opinion.

*Ghanim v. Colvin*, 763 F.3d 1154, 1162 (9th Cir. 2014) (citations omitted). The ALJ seems to have implicitly applied this principle here, insofar as his opinion emphasizes both that Plaintiff's self-reported symptoms and limitations were exaggerated and that the opinions of Dorfman and Sherban include limitations that appear excessive, in light of their own findings and the entire medical record, and seem more to reflect Plaintiff's statements about his symptoms and limitations.

In sum, the Court finds that the ALJ provided the required "good reasons" for the weight that he assigned to the opinions of Dorfman and Sherban.

---

[10] *See, e.g.*, Tr. at 1116 ("I did review recent IME findings with the patient with finding [sic] multiple discrepancies during examination as well as treatment. First off, examiner only spent 5 minutes with the patient where I've seen the patient now over multiple follow-up visits and have much better understanding for where the patient is with regards to his present treatment and ability to perform activities of daily living. During five-minute examination, IME examiner is not able to make appropriate determinations on patient's ability to perform his activities . . . Patient did have his grandfather with [at] examination with him who additionally will verify that multiple tests that are documented [by Dr. Karpman] were not indeed performed . . . .").

### The ALJ's Alleged Reliance on his Own Lay Opinion to Make His RFC Finding

Plaintiff further maintains that the ALJ's RFC finding did not adopt the limitations contained in any particular medical opinion, and that such determination must therefore be based on the ALJ's own interpretation of the medical data, rather than on substantial evidence. *See, e.g.*, Pl. Memo of Law, ECF No. 11-1 at p. 19 (Asserting that the ALJ "craft[ed] an RFC which corresponded to no opinion on the record and failed to account for limitations found by some of the doctors the ALJ partially credited.").

However, the premise of Plaintiff's argument – that the RFC finding must correspond to a particular medical opinion and must incorporate every limitation contained in every opinion given weight by the ALJ-- is incorrect:

> "The RFC assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." Titles II & XVI: Assessing Residual Functional Capacity in Initial Claims, SSR 96-8P, 1996 WL 374184 at *1 (S.S.A. July 2, 1996) (emphasis added). Therefore, the ALJ's RFC determination need not perfectly correspond with any one of the opinions of the medical sources cited in his or her decision, so long as he or she has "weigh[ed] all of the evidence available to make an RFC finding that [is] consistent with the record as a whole." *Matta v. Astrue*, 508 F. App'x 53, 56 (2d Cir. 2013).

*Violet-Maria R. v. Comm'r of Soc. Sec.*, No. 1:19-CV-0999 (CJS), 2021 WL 1169186, at *4 (W.D.N.Y. Mar. 29, 2021).

An ALJ cannot, of course, arbitrarily substitute his own lay opinion for competent medical opinion evidence. *See, e.g., Riccobono v. Saul*, 796 F. App'x 49, 50 (2d Cir. 2020) ("[T]he ALJ cannot arbitrarily substitute h[er] own judgment for competent medical

18

opinion." *McBrayer v. Secretary of Health and Human Servs.*, 712 F.2d 795, 799 (2d Cir. 1983)."). However, as just mentioned, an ALJ is entitled to make an RFC finding that is consistent with the record as a whole, even if it does not perfectly match a particular medical opinion. *See, Matta v. Astrue*, 508 F. App'x 53, 56 (2d Cir. 2013) (Rejecting argument that ALJ had improperly substituted his medical judgment for expert opinion, stating that: "Although the ALJ's conclusion may not perfectly correspond with any of the opinions of medical sources cited in his decision, he was entitled to weigh all of the evidence available to make an RFC finding that was consistent with the record as a whole."); *see also, Camille v. Colvin*, 652 F. App'x 25, 29 n. 5 (2d Cir. 2016) ("The ALJ used Dr. Kamin's opinion as the basis for the RFC but incorporated additional limitations based on, inter alia, the testimony of Camille that she credited. An ALJ may accept parts of a doctor's opinion and reject others.") (citations omitted).

    Here, the ALJ did not run afoul of these rules by crafting an RFC based on his own "lay surmise," contrary to what Plaintiff maintains.   Rather, the ALJ examined the entire record, including medical opinions ranging from that of Dr. Karpman, who asserted that Plaintiff had no limitations, to that of Dr. Sherban, who asserted that Plaintiff had completely-disabling limitations, and made an RFC determination that did not perfectly correspond to any one medical opinion but which was nevertheless supported by substantial evidence.   Consequently, this aspect of Plaintiff's motion also lacks merit.

CONCLUSION

For the reasons discussed above, Plaintiff's motion (ECF No.11) for judgment on the pleadings is denied and Defendant's cross-motion (ECF No. 13) for the same relief is granted. The Clerk of the Court is directed to enter judgment for Defendant and close this action.

So Ordered.

Dated: Rochester, New York
September 9, 2021

ENTER:

*Charles J. Siragusa*
CHARLES J. SIRAGUSA
United States District Judge